Affirmed and Memorandum Opinion filed December 28, 2010.

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00295-CV



 

Securitycomm Group, Inc. and
Westex Communications, L.L.C.,
Appellants

V.

Douglas Brocail, Andrew
Engleman, NXS Construction, Inc., and Ronnie Hooks, Appellees

 



On Appeal from the 215th
District Court

Harris County, Texas

Trial Court Cause No. 2004-09001



 

MEMORANDUM OPINION

 

In this opinion, we consider three separate appeals
filed from the trial court’s final judgment.  The disputes between the parties
all stem from the sale of Westex Communications, L.L.C., a telecommunications
firm, by appellees/cross-appellants, Douglas Brocail, Andrew Engleman, and
Ronnie Hooks, to appellant/cross-appellee SecurityComm Group, Inc.  Appellee NXS
Construction, Inc. is a holder of a promissory note issued by appellant Westex. 
After a jury trial, the trial court disposed of certain issues that had been reserved
for the court, granted judgment on the jury’s verdict on certain issues, and
granted judgment notwithstanding the verdict (JNOV) on certain other issues. 
SecurityComm filed an appeal concerning portions of the final judgment favoring
Brocail, Engleman, and Hooks.  Brocail, Engleman, and Hooks filed a
cross-appeal concerning portions of the judgment favoring SecurityComm.  And
Westex filed its own separate appeal on a portion of the judgment favoring NXS
Construction.  We affirm the trial court’s judgment.

I.  Background

Westex, a telecommunications company, was founded in
2001 by Scott Hanley and Ralph Senior.  Apparently in need of working capital,
Senior began looking for additional investors.  In December 2002, Douglas
Brocail and Andrew Engleman invested in Westex.  Around the same time, Ronnie
Hooks was hired as CFO and given an interest in the company.  Senior’s interest
in Westex was bought out in 2003.

As CFO, Hooks began working on Westex’s books, which
were in a state of disarray.  He hired a consulting company (“DMA”), which
informed him that the company owed significant back taxes.  An estimate of the
taxes owed was calculated to be a little over $100,000.  This amount was paid largely
through a loan from Engleman’s separate company, NXS Construction, Inc.  In
return, NXS received a $100,000 promissory note from Westex.

In 2003, SecurityComm Group, Inc. began investigating
the possibility of acquiring Westex.  The founder and CEO of SecurityComm was
Robert Strange, an experienced businessman.  SecurityComm was given access to
Westex’s financial records and thus became aware, at least to some extent, of
Westex’s financial and tax difficulties.  An Acquisition Agreement was drafted
by Thompson & Knight, attorneys representing SecurityComm.  The agreement
was also reviewed by an attorney representing the Westex unitholders (Brocail,
Engleman, Hooks, and Hanley).  Under the terms of the agreement, SecurityComm
was to pay the unitholders a total of $819,763 for Westex, although each
unitholder was to receive a different amount depending primarily upon the
number of units he owned and any amounts he may have loaned to Westex.  For
example, in exchange for Engleman’s 125 units, SecurityComm essentially agreed
to pay the $100,000 promissory note held by Engleman’s company, NXS, plus accrued
interest.

Because of Westex’s tax difficulties, the subject of
taxes owed was covered in some depth in the Acquisition Agreement and was a
major point of contention in the resulting litigation.  In section 3.10, titled
“Taxes, Tax Returns,” the agreement states as follows:

Unitholders represent that Westex has timely filed all tax returns
and reports except as otherwise disclosed in Section 3.10 of the Disclosure
Schedule, that there have never been any audits of the tax returns . . . .  Except
to the extent set forth and described in Section 3.10 of the Disclosure
Schedule, there are no claims against Westex, or the Unitholders related to
their interest in Westex, for federal, state or local income, sales, use,
franchise or other taxes, including but not limited to telephone tariffs and
any other licensing fee, tariff or tax relating to the Business of Westex, for
any period or periods prior to and including the balance sheet date included in
the Financial Statements, and there is no matter pending which may result in
such a claim.  Section 3.10 of the Disclosure Schedule sets forth a complete
and accurate list of all unpaid taxes of Westex as of the Closing Date.  Neither
Westex nor the Unitholders have received any notice of any claim, whether
pending or threatened, for taxes, which would create a lien on the assets of Westex
or adversely affect the Business. . . .

 

The referenced section 3.10 of the Disclosure
Schedule states in full as follows:

As an additional disclosure the parties acknowledge the
existence of possible additional telecommunications taxes, as shown in the
attached Exhibit 3.10, which may be assessed by taxing authorities subsequent
to an audit.  Any such additional assessment, or the settlement thereof, shall
not be offset against the Brocail Note [payment of which was in exchange for
Brocail’s Westex units] except to the extent that the aggregate amount of such assessment
or settlement exceeds 10% of the amount shown on the schedule.

 

A “Summary of Unpaid Telecom Taxes” attached to the
Acquisition Agreement revealed unpaid taxes in the amount of $494,351.43.  This
figure was also reflected in a balance sheet attached to the agreement, albeit
as “Sales Tax Payable & Tariffs.”  Prior to closing, Westex apparently received
a notice of tax audit from the State of Texas and completed and returned an
audit questionnaire.  Amy Mian, Westex’s former controller, testified that also
prior to closing, she advised Wesley Jaynes, SecurityComm’s COO, that Westex
had received the audit notice, and she even gave him a copy of the
questionnaire.  While Jaynes did not testify at trial in this case, Strange,
SecurityComm’s CEO, indicated that he did not know about the audit until after
closing.  Strange further testified that had he known about the audit, he would
have postponed closing on SecurityComm’s purchase of Westex.  He further
averred that had he known the true extent of Westex’s outstanding tax
liability, which SecurityComm contends was far greater than revealed in the
closing documents, he would not have gone forward with the acquisition.

Anne Martin, an auditor with the Texas State Comptroller’s
Office, testified that she contacted Westex in 2003 and conducted an audit of
the company in 2004 (after SecurityComm’s acquisition).  She recounted her
difficulties in getting cooperation from Westex in the audit process as well as
her uncertainty regarding the accuracy of the audit’s conclusions.  The State
of Texas ultimately sued Westex, SecurityComm, Strange, and others for Westex’s
back taxes and associated penalties.  That lawsuit is still pending and is being
defended by SecurityComm.

The balance sheet attached to the Acquisition Agreement
further reflected over $660,000 in accounts receivable.  Strange testified that
he was told by Hooks prior to closing that these receivables were largely
collectable, only to later discover that they were largely uncollectable.  The Acquisition
Agreement additionally states that it “constitutes the entire agreement among
the parties . . . and supercedes all other prior agreements and understandings,
both written and oral.”  Closing occurred on December 1, 2003.  Westex
continued to have tax issues post-closing, and the State’s tax collection
lawsuit included amounts due both before and after closing.

After closing, Westex/SecurityComm made only one
payment to Brocail and one to Engleman for the acquisition of Westex.  SecurityComm
maintains in this lawsuit that the failure to make payments was because the
full extent of Westex’s financial troubles was becoming clear, including the
tax liability, the notice of tax audit, and the largely uncollectible accounts
receivable.  In contrast, Brocail, Engleman, and Hooks maintain that
SecurityComm had knowledge of the issues facing Westex prior to the acquisition
and then began funneling money out of Westex after closing.[1]

On February 23, 2004, Brocail, Engleman, Hooks, and
NXS Construction sued SecurityComm and Westex for payment as set forth in the
Acquisition Agreement.  SecurityComm counterclaimed for fraud, fraud in a stock
transaction, and breach of the Acquisition Agreement.  At the conclusion of
trial, the jury found that although SecurityComm had failed to comply with the
Acquisition Agreement and to pay a promissory note to Brocail as required in
the agreement, such performance was excused.  The jury further found that Brocail,
Engleman, and Hooks each committed fraud and fraud in a stock transaction and
on those bases, awarded SecurityComm $567,810.15 for future out-of-pocket
expenses.  However, the jury declined to award sums to SecurityComm for past
out-of-pocket expenses.  Additionally, the jury found that Brocail, Engleman,
and Hooks did not fail to comply with the Acquisition Agreement and that Westex
did not fail to pay the promissory note to NXS.

In response to motions to disregard filed by both
sides, the trial court disregarded the jury’s finding that Westex had not
failed to pay the NXS note, as well as the finding of future fraud damages for
SecurityComm.  Regarding the future damages, the court expressly stated that
such damages were too “conjectural, speculative, and contingent” to be
awarded.  Pursuant to agreement of the parties, the court further determined
the question of novation as it related to the NXS note, finding that no
novation occurred.  The court granted judgment favoring NXS on the NXS note,
including attorney’s fees, but awarded no other damages to any other party.

II.  Issues on Appeal

In its appeal, SecurityComm challenges the trial
court’s JNOV on future damages for fraud.  It further contends that there was
conclusive evidence demonstrating past damages for fraud, as well as Brocail,
Engleman, and Hooks’ failure to comply with the Acquisition Agreement and
resulting damages therefrom.  In their cross-appeal, appellees/cross-appellants,
Brocail, Engleman, and Hooks, primarily contend that the trial court erred in refusing
to disregard the jury’s findings that SecurityComm was excused from performing
its obligations under the Acquisition Agreement.  In its appeal, Westex challenges
the trial court’s disregarding of jury question no. 15, regarding whether
Westex failed to pay the NXS promissory note, and the court’s finding that no
novation of that debt occurred.

III.  SecurityComm’s Appeal

            In its first
issue, SecurityComm contends that the trial court erred in disregarding the jury’s
award of future damages to SecurityComm for fraud.  In its second, third, and
fourth issues, SecurityComm contends that the evidence established as a matter
of law that (1) SecurityComm sustained past damages from fraud, (2) appellees
failed to comply with the Acquisition Agreement, and (3) SecurityComm sustained
damages from appellees’ failure to comply.  In its fifth issue, SecurityComm
contends that the trial court erred in refusing to award it attorney’s fees. 
In two cross-issues, in the event we sustain any of SecurityComm’s issues,
appellees contend that (1) the evidence was legally and factually insufficient
to support the finding of future damages, and (2) the evidence was legally
insufficient to support the findings of fraud.

A.  JNOV on Future Damages

            In response to
charge questions 24 and 26, the jury found that appellees committed fraud and
fraud in a stock transaction against SecurityComm.  In response to questions 25
and 27, the jury found that this fraud caused SecurityComm future out-of-pocket
expenses in the amount of $567,810.15.  The trial court granted appellees’
motion to disregard the jury’s damages responses and entered a JNOV that
SecurityComm take nothing on its fraud claims.[2] 
As stated, in its first issue, SecurityComm challenges the trial court’s granting
JNOV against the future damages awarded by the jury.

We review a JNOV under a no-evidence standard,
crediting evidence favoring the jury verdict if reasonable jurors could and
disregarding contrary evidence unless reasonable jurors could not.  Tanner
v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 830 (Tex. 2009) (citing City
of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005)).  We must uphold the
jury’s finding if more than a scintilla of competent evidence supports it.  Id. 
Ultimately, the test is whether the evidence presented at trial was sufficient
for reasonable and fair-minded people to reach the verdict rendered.  Id.
 With respect to the recovery of future damages, Texas follows the reasonable
probability rule, under which a plaintiff must:  (1) present evidence that, in
reasonable probability, it will incur expenses in the future, and (2) prove the
probable reasonable amount of the future expenses.  MCI Telecomms. Corp. v.
Tex. Utils. Elec. Co., 995 S.W.2d 647, 654–55 (Tex. 1999).

In charge questions 25 and 27, the jury was asked
about “out-of-pocket expenses” that were “a natural, probable and foreseeable
consequence of the fraud.”  With regard to future damages, they were further
instructed that such damages must “in reasonable probability . . . be sustained
in the future.”  The charge in this case used the term “out-of-pocket expenses”
(emphasis added) and then did not define that term for the jury.[3] 
The jury was therefore free to use the ordinary definition of “out-of-pocket”
rather than the legal definition in Texas, and our review is similarly defined. 
See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (holding that court
could not review the sufficiency of the evidence based on a particular legal
standard because that standard was not submitted to the jury and no party
objected to the charge on this ground or requested that the jury be charged
using the standard in question); Tex. Mut. Ins. Co. v. Morris, 287
S.W.3d 401, 409 (Tex. App.—Houston [14th Dist.] 2009, pet. filed) (same).[4] 
“Out-of-pocket” is commonly defined as “[c]alling for the spending of cash,” or
“consisting of or requiring an actual cash outlay.”  The American Heritage
Dictionary 883 (2d College Ed. 1991) (“the spending of cash”); Webster’s Third
New International Dictionary 1603 (1993) (“actual cash outlay”).  The ordinary
definition does not require a value comparison, as does the legal definition,
but contemplates any outlay of cash.  Thus, under the charge given, the jury
was free to award any outlay of cash, so long as it was “reasonably probable,”
“natural . . . and foreseeable,” and “proximately caused” by the alleged fraud.

In its order disregarding the jury’s findings of
future damages ($567,810.15), the trial court noted that this dollar figure was
the exact amount listed on exhibit 299 as the State of Texas’s estimate of
sales tax, penalties, and interest owed by Westex for the period from December
2002 to November 2003 (closing having occurred in December 2003).[5] 
In her testimony, Anne Martin, an auditor with the State comptroller’s office,
explained that exhibit 299 was a “breakdown summary” prepared from other
records kept by the comptroller’s office.  In disregarding the jury’s answer,
the trial court further concluded that because the amount from exhibit 299 was
“conjectural, speculative, and contingent,” it was “too uncertain to support an
award from the trial court under Texas law.”[6]

As SecurityComm notes, the trial court did not
disturb the jury’s findings regarding fraud and fraud in a stock transaction;
the court merely determined that the jury’s response about the amount of future
damages resulting from the fraud lacked legally sufficient support in the
record.  SecurityComm contends that as a result of appellees’ fraud, it
acquired “not only Westex, but all of its outstanding state sales tax
liabilities as well.”  It insists that this liability was far greater than
revealed by appellees in the Acquisition Agreement and that had the full extent
of the liability been revealed, SecurityComm would not have acquired Westex.

In support of its assertions, SecurityComm first
points to the fact that it and its CEO, Strange, have been named in a lawsuit,
along with Westex and others, filed by the State of Texas for the collection of
Westex’s past due taxes.  In that lawsuit, the State has alleged that
SecurityComm is liable for Westex’s taxes under section 111.020 of the Texas
Tax Code because SecurityComm bought Westex.  Tex. Tax Code § 111.020.[7] 
Merely being named in a lawsuit is not proof of the claims alleged.  In that
lawsuit, SecurityComm has generally denied all of the allegations against it. 
It has also specifically alleged that it is not liable for Westex’s taxes
because it has sold Westex to a third party.  It further contends that the
State’s allegations include incorrect dates for SecurityComm’s ownership of
Westex, and it raises other defenses.  There is no indication in the record
that the lawsuit has been resolved or that SecurityComm has dropped any of its
defenses.  In fact, in his testimony regarding the tax lawsuit, Strange stated
that nothing had been paid, there was no agreement to make any payments,
liability is disputed, and he has not agreed with anything the State alleged in
that lawsuit.

SecurityComm further points to the fact that the
State attached a delinquency certificate to its petition in the tax collection
suit and that under section 111.013 of the Tax Code, this certificate is
considered prima facie evidence of the delinquency and the amounts due.  Id.
§ 111.013.  While this certificate shows an amount past due of $912,993.75, as
of September 30, 2005, it does not segregate that number as to time periods
such that it can be determined whether any portion of the alleged delinquency
was incurred prior to SecurityComm’s acquisition of Westex, much less the
amount that was due at the time of the acquisition.  Furthermore, section
111.013 states that the certificate is prima facie evidence “[i]n a suit
involving the establishment or collection of a tax imposed under Title 2 or
Title 3 of this code.”  Id. § 111.013.  Therefore, although the
certificate might constitute prima facie evidence in the pending tax lawsuit,
it does not constitute prima facie evidence in this lawsuit.

Next, SecurityComm cites exhibit 299, which purports
to provide an estimate of sales tax, penalties, and interest owed by Westex for
the period running from December 2002 to November 2003, immediately prior to
SecurityComm’s acquisition of Westex.  This sparse document provides only bare
numbers and does not state any basis for the calculation of such numbers.  Martin
testified that the figures on the exhibit come from other records kept by the
comptroller’s office but was not specifically asked what those records were.

SecurityComm also relies heavily on the audit report
prepared by Martin.  The report is compiled largely of columns of figures,
which are difficult if not impossible to understand without Martin’s
testimony.  Martin explained in some detail what the figures represented and
how she calculated them.  She also explained that she was not ultimately
comfortable with the results of her audit.  She stated that she first contacted
Westex in late December 2003, shortly after SecurityComm’s acquisition.  In
March 2004, she visited Westex’s offices and reviewed financial and banking
records.  At that time, Ramji Raman, her primary Westex contact, provided her
with the reports she requested, but she never had direct access to the computer
data files.

During the initial stages, Westex personnel were
cooperative.  However, when Martin later attempted to follow up with Westex, to
gather additional documentation and correct any errors, Westex employees
refused to communicate with her.  She sent a “reconciliation email” to Raman,
but he did not respond.  She sent additional emails and made phone calls to
Westex, but still received no response.  When she visited the offices again in
April or May of 2004, the doors were locked, and the offices had been emptied.

She expressed her belief that there were some
problems with the records she had been given.  The purpose of the
reconciliation process was (1) to obtain additional documentation regarding
whether certain revenues were taxable, and (2) to permit the taxpayer a chance
to point out any errors in the audit, such as duplicate transactions,
transposed numbers, mathematical errors, nontaxable income, and the like.  She
admitted that she had committed such errors in past audits.  She also testified
that it was up to the taxpayer to point out any errors, and Westex was given
ample opportunity to do so.

Martin further acknowledged her uncertainty regarding
whether all of the bank deposits she had included were taxable income.  She was
not given information permitting her to exclude sales made by Westex in
Georgia, even though she was aware that Westex had sales in Georgia and tax
returns admitted into evidence at trial showed Georgia revenue.  She might have
excluded certain numbers called “CABS revenue” if Westex had shown her a
computer printout that was also admitted into evidence.  Because she had not
been provided with information regarding amounts that constituted
reimbursements instead of revenue, she did not exclude those amounts from the
tax audit.  After the final audit report issued on April 21, 2005 (after
SecurityComm sold Westex), Westex still could have sought redetermination but
did not.  In summary, the bare numbers of the audit report are of little value
absent Martin’s explanatory testimony, and in her testimony, Martin recounted
numerous difficulties in computing accurate numbers for the back taxes owed.

SecurityComm additionally complains that it did not
have the resources to contest the amounts in the audit report because of appellees’
poor bookkeeping.  In support, SecurityComm cites only to Martin’s testimony in
which she described problems she encountered reconciling the audit report from
the records made available to her by Westex.  But evidence that Martin had difficulty
getting records from Westex after SecurityComm acquired Westex is not evidence
that SecurityComm had no ability to contest the audit results.  As recounted by
Martin, Westex under SecurityComm’s ownership simply failed to respond to her
attempts to reconcile the audit numbers, and Westex also did not challenge the results
of the audit.  Theoretically, SecurityComm might have been able to show that
appellees’ recordkeeping had been so inept that the audit numbers could not
have been successfully rebutted, but Martin’s testimony does not establish that
fact.[8]

Another difficulty with the figure provided by the
jury ($567,810.15) is that even if there was support in the record for that
dollar figure as the amount of taxes, penalty, and interest owed by Westex at
the time of SecurityComm’s acquisition of the company, it does not necessarily
follow that liability for that entire amount was caused by appellees’ fraud.[9] 
The Acquisition Agreement specifically recites that Westex owed at least
$494,351.43 in back taxes at the time of closing.  The agreement further
provides for a 10 percent cushion before SecurityComm could offset the tax
liability against the amount owed to Brocail for the purchase of Westex.  Thus,
the $494,351.43 plus 10 percent figure ($543,786.57) was part of the bargain
reached between the parties.  SecurityComm agreed to assume that liability as
part of its acquisition of Westex.[10] 
Thus, it was not an out-of-pocket expense caused by the alleged fraud.  Cf.
Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 817
(Tex. 1997) (explaining that a defendant in a misrepresentation claim should not
be made an insurer of the plaintiff’s entire investment, or for risks the
plaintiff knowingly accepted, but should be held accountable only for losses
proximately caused by the misrepresentation).  This fact combined with the
considerable difficulties surrounding computation of the tax figures for
Westex, and the ongoing controversy regarding whether SecurityComm was liable
for any of Westex’s taxes (i.e., the State’s tax collection
lawsuit), rendered the evidence too uncertain to support the jury’s award.    

Because the evidence presented at trial was
insufficient for reasonable and fair-minded people to conclude that $567,810.15
was a reasonable amount for SecurityComm’s future out-of-pocket expenses, the
trial court properly disregarded the jury’s answers to charge questions 25 and
27.  See Tanner, 289 S.W.3d at 830; MCI Telecomms., 995 S.W.2d at
654–55.  Accordingly, we overrule SecurityComm’s first issue.

B.  Past Damages

            In its second
issue, SecurityComm contends that the evidence established its past damages
from fraud as a matter of law.  We utilize the well-established standards of
review in considering this legal sufficiency challenge to the jury’s finding of
no past damages.  See City of Keller v. Wilson, 168 S.W.3d at 809–23; Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  As with its first
issue, this argument is based on the jury’s responses to question 25 and 27:
while the jury found future out-of-pocket expenses, it failed to find that any
past out-of-pocket expenses were proximately caused by appellees’ fraud.

            Specifically,
SecurityComm contends that it presented undisputed evidence of past damages in
that it showed three payments were made for the acquisition of Westex:  (1)
$22,599 to Engleman, (2) $23,425.28 to Senior, and (3) $8,532 to Brocail.  It
further complains that it paid $65,000 in attorney’s fees to the law firm of
Thompson & Knight for services in connection with the acquisition.  SecurityComm
contends that these payments were uncontroverted and were proximately caused by
appellees’ fraud.  In total, SecurityComm contends that it conclusively proved
$119,556.28 in past out-of-pocket expenses.

            As appellees
point out, however, evidence was admitted demonstrating that each of the payments
claimed by SecurityComm as its out-of-pocket expenses actually were paid from
Westex’s funds.  Thus, under the charge submitted, the jury could have
determined that these payments were not “cash outlays” or “out-of-pocket expenses”
for SecurityComm.  In other words, the jury could have concluded that resources
obtained in the acquisition of Westex were used to make these payments, so they
were not out-of-pocket expenses for SecurityComm.    We overrule issue two.

C.  Failure to Comply

            In its third issue,
SecurityComm contends that there is no evidence to support the jury’s negative
answer to charge question no. 29, which asked whether appellees “fail[ed] to
comply with the Acquisition Agreement.”  No definitions or instructions were
provided with question no. 29.  SecurityComm asserts that because it
conclusively established appellees’ failure to comply with the agreement, the
trial court erred in refusing to enter a JNOV on this claim.  In its fourth
issue, SecurityComm maintains that it conclusively proved the damages which
resulted from appellees’ alleged failure to comply.  We again utilize
well-established standards in reviewing these legal sufficiency challenges.  See
City of Keller, 168 S.W.3d at 809–23; Dow Chem., 46 S.W.3d at 241.

In support of its contentions, SecurityComm points to
the various representations made by appellees in the Acquisition Agreement
regarding past occurrences and circumstances existing at the time of execution,
e.g., that Westex had timely filed all tax returns, that there were no
pending tax matters, that no notice of any tax audit had been received.  None
of the matters SecurityComm relies upon, however, constituted promises of
future action.  SecurityComm does explain how misrepresentations of prior fact
or existing circumstances in an agreement can constitute a failure to comply
with that agreement.[11] 


In its reply brief, SecurityComm points out that a
party to a contract can be held liable for false representations made in the
contract.  However, the jury here was not asked in question no. 29 whether any
representations were false but whether there was a failure to comply with the
agreement.  In one case cited by SecurityComm, Trinity Industries Inc. v.
Ashland, Inc., the trial court gave specific instructions that permitted
the jury to find a failure to comply based on misrepresentations within the
agreement.  53 S.W.3d 852, 861 (Tex. App.—Austin 2009, pet. denied).  No such
instructions were given in this case.  The other case SecurityComm relies upon,
Glenn A. Magarian, Inc. v. National Finance Corp., is also highly
distinguishable from the present case:  it involved an appeal from a grant of
summary judgment, enforcing an arbitration award in a breach of warranty case,
and it did not involve a jury charge on “failure to comply.”  No.
05-97-00663-CV, 1999 WL 814289, at *1 (Tex. App.—Dallas Oct. 13, 1999, pet.
denied) (not designated for publication).

Because SecurityComm has not produced conclusive
evidence of a failure to comply, it has not established that the trial court
erred in refusing to enter a JNOV on this issue.  See City of Keller,
168 S.W.3d at 809–23; Dow Chem., 46 S.W.3d at 241.  And because the
trial court did not err in refusing to enter a JNOV on this claim, SecurityComm
was not entitled to damages for the alleged failure to comply.  We overrule
SecurityComm’s third and fourth issues.

D.  Attorney’s Fees and Costs

            Lastly, in its
fifth issue, SecurityComm asserts that the trial court erred in refusing to
award it attorney’s fees.  Two of SecurityComm’s contentions under this issue
have been rendered moot by our holdings above.  Specifically, SecurityComm
alleges that it is entitled to fees in the event this court (1) reinstates the fraud
damages found by the jury, or (2) finds that SecurityComm conclusively proved
damages from appellees’ failure to comply with the agreement.  Because we do
not find in SecurityComm’s favor on the fraud issues or the failure to comply
issue, SecurityComm is not entitled to attorney’s fees on those claims.

In its remaining contention regarding fees, SecurityComm
maintains that it is entitled to fees because it prevailed against appellees’
breach of contract claims, in which appellees alleged that SecurityComm failed
to comply with the Acquisition Agreement and failed to pay Brocail on a
promissory note as required under the Acquisition Agreement.  Although the jury
found that SecurityComm had failed to comply, it also found that such failure
was excused.[12] 


SecurityComm bases its claims for attorney’s fees on
a stipulation the parties entered into during trial.  Under the stipulation,
SecurityComm was entitled to attorney’s fees “for any claim upon which
SecurityComm receive[d] a favorable verdict and which permit[ted] the recovery
of attorney’s fees.”  In its briefing to this court, SecurityComm provides no
basis for concluding that appellees’ failure-to-comply claims were claims
permitting SecurityComm to recover its attorney’s fees as required by the
stipulation.  See Tex. R. App. P. 38.1 (i) (“The brief must contain a
clear and concise argument for the contentions made, with appropriate citations
to authorities and to the record.”).  Generally, successful defendants in
breach of contract actions are not entitled to recover attorney’s fees.  See
Cytogenix, Inc. v. Waldroff, 213 S.W.3d 479, 490–91 (Tex. App.—Houston [1st
Dist.] 2006, pet. denied).  Because SecurityComm has not established its entitlement
to attorney’s fees, we overrule its fifth issue.

E.  Cross-Issues

            Appellees raised
two cross-issues in the event we sustain any of SecurityComm’s issues:  (1) the
evidence was legally and factually insufficient to support the finding of
future damages, and (2) the evidence was legally insufficient to support the
findings of fraud.  Because we have not sustained any of SecurityComm’s issues,
we need not address appellees’ contingent cross-issues.  Accordingly, they are
overruled as moot.

IV.  Brocail, Engleman, and Hooks’ Appeal

            In their
cross-appeal, cross-appellants, Brocail, Engleman, and Hooks, contend that the
trial court erred in refusing to disregard the jury’s answers to charge
questions 11, 20, and 21.  In response to those questions, the jury found that
SecurityComm’s failure to comply with the Acquisition Agreement and to pay the
Brocail note, as required under the Acquisition Agreement, was excused.

Specifically, question 11 permitted the jury to find
that SecurityComm’s failure to pay the note was excused if the jury found that
Brocail, or another who acted with Brocail’s authority or apparent authority: 
(1) had previously failed to comply with a material obligation, (2) committed
fraud by making a false representation of a past or existing fact, (3) was
equitably estopped because of making a false representation or concealing
material facts, or (4) made a negligent misrepresentation.  Questions 20 and 21
authorized the jury to find that SecurityComm was excused from failing to
comply with the Acquisition Agreement if it found that respectively, Brocail or
Engleman, or another who acted with their authority or apparent authority:  (1)
committed fraud by making a false representation of a past or existing fact,
(2) was equitably estopped because of making a false representation or concealing
material facts, or (3) made a negligent misrepresentation; or if (4) the
parties at some point agreed that a new agreement would take the place of the
Acquisition Agreement, or (5) a different performance was accepted in full
satisfaction of the obligations in the agreement.

In five issues, cross-appellants specifically assert
that SecurityComm could not avail itself of a fraud-based excuse to its
performance because (1) it accepted the benefits of the agreement and did not
seek rescission, (2) evidence conclusively negated justifiable reliance on any
misrepresentation, (3) no evidence exists of an injury caused by any alleged
misrepresentations, (4) certain of the alleged misrepresentations were not
actionable statements of fact but were merely expressions of opinion, and (5)
there was no evidence that the representation regarding an accounts receivable
of $660,000 was false.  On the basis of these issues, cross-appellants request
entry of a judgment based on the jury’s finding that SecurityComm failed to comply.

A.  Waived Grounds

            We begin by pointing
out that in their issues and arguments, cross-appellants fail to properly challenge
certain grounds on which questions 20 and 21 permitted the jury to base a
finding of excuse.  Although the issues and arguments can be read as
challenging all grounds related to the alleged misrepresentations, they do not
challenge the grounds pertaining to a new agreement taking the place of the
Acquisition Agreement or the acceptance of a different performance.  Clearly, none
of cross-appellants’ issues address these grounds, as they are expressly aimed at
the fraud- and representation-based grounds.  The only mention of the
non-representation-based grounds in cross-appellants’ briefing is the bare
statement that there was no evidence to support a finding by the jury based on
them.  Although cross-appellants cite the charge, they do not otherwise cite
the record or any authority, and they do not offer any analysis of these
grounds.  Consequently, we find that cross-appellants did not properly brief these
grounds.  See Tex. R. App. P. 38.1 (i).  The jury’s finding that
SecurityComm was excused for its failure to comply with the Acquisition
Agreement is therefore supported by these unchallenged grounds.  However, because
cross-appellants sufficiently challenged all of the grounds on which question
11 permitted the jury to find that SecurityComm’s failure to pay on the note
was excused, we address the merits of the grounds that are common to questions
11, 20, and 21.[13] 


B.  Ratification

In their first issue, cross-appellants contend that
SecurityComm could not legally avoid its obligations under the Acquisition
Agreement because it had accepted the benefits of and did not rescind the
agreement, i.e., it had ratified the agreement.  Cross-appellants base
their reasoning on the “general proposition of law” that a party fraudulently
induced into a contract has its choice of remedies:  it can “stand to the
bargain” and recover damages for the fraud, or it can rescind the contract,
returning what it received under the contract and receiving back what it gave
pursuant to the contract.  See Fortune Prod. Co. v. Conoco, Inc., 52
S.W.3d 671, 676–77 (Tex. 2000) (citing Dallas Farm Mach. Co. v. Reaves,
158 Tex. 1, 9–11, 307 S.W.2d 233, 238–39 (1957)).  According to
cross-appellants, because SecurityComm chose to sue for damages and kept the
benefits under the Acquisition Agreement rather than rescinding, it cannot use
cross-appellants’ alleged fraud as an excuse for failing to comply with the
agreement.  In short, cross-appellants assert that SecurityComm ratified the
contract after learning of the fraud and thus cannot use the fraud as an excuse
for its failure to perform.

If a party fraudulently induced to enter into a
contract continues to receive benefits under the contract after learning of the
fraud, or otherwise engages in conduct recognizing the agreement as binding,
then the party has ratified the agreement and waived any right to assert the
fraud as a basis to avoid the agreement.  PSB, Inc. v. LIT Indus. Tex’ Ltd.
P’ship, 216 S.W.3d 429, 433 (Tex. App.—Dallas 2006, no pet.) (citing Rosenbaum
v. Tex. Bldg. & Mortg. Co., 140 Tex. 325, 329, 167 S.W.2d 506, 508
(1943)); Harris v. Archer, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004,
pet. denied) (same).  An express ratification is not necessary; any act based
upon a recognition of the agreement as existing, or conduct inconsistent with
an intention to avoid it, has the effect of waiving the right of rescission.  Rosenbaum,
140 Tex. at 329, 167 S.W.2d at 508.  The relevant inquiry examines the actions
taken by the defrauded party after that party becomes fully aware of the
fraud.  Harris, 134 S.W.3d at 427 (citing Land Title Co. of Dallas,
Inc. v. F.M. Stigler, Inc., 609 S.W.2d 754, 756–57 (Tex. 1980)).

Ratification is an affirmative defense that must be
pleaded and proven.  See Petrol. Anchor Equip., Inc. v. Tyra, 419 S.W.2d
829, 834 (Tex. 1967).  Under Texas Rule of Civil Procedure 94, a party “pleading
to a preceding pleading” must “set forth affirmatively” those specific matters
listed in the rule and “and any other matter constituting an avoidance or
affirmative defense.”  Tex. R. Civ. P. 94.  Although, typically, affirmative
defenses are pleaded by a party opposing a claim for recovery or relief, the
language of Rule 94 clearly requires the pleading of any “matter constituting
an avoidance” of any other matter—claim for relief or defense—asserted in
another pleading, regardless of the alignment of the parties.  Id.; see
also Compass Bank v. MFP Fin. Servs., Inc., 152 S.W.3d 844, 853
(Tex. App.—Dallas 2005, pet. denied); Royal Typewriter Co. v. Vestal,
572 S.W.2d 377, 378 (Tex. App.—Houston [14th Dist.] 1978, no writ).  Thus, in
order for a plaintiff to rely on an affirmative defense, or “matter in
avoidance,” to defeat a defendant’s affirmative defense, the plaintiff must
allege it in a petition or supplemental petition.  Simmons v. Compania
Financiera Libano, S.A., 830 S.W.2d 789, 792–93 (Tex. App.—Houston [1st
Dist.] 1992, writ denied); Royal Typewriter, 572 S.W.2d at 378.

Here, cross-appellants have not asserted that they
pleaded ratification as a defense to SecurityComm’s pleading that cross-appellants
breach of contract claims failed due to fraud, and our review of the record has
not revealed any such affirmative defense.  Consequently, cross-appellants
cannot rely on the ratification affirmative defense on appeal.  We overrule
their first issue.

C.  Legally
Insufficient Evidence of Excuse

            In their remaining
issues, cross-appellants challenge the legal sufficiency of the evidence to
support the jury’s findings that SecurityComm’s failure to comply was excused. 
Specifically, in their second and third issues, cross-appellants contend,
respectively, that (1) the evidence conclusively negated SecurityComm’s justifiable
reliance on any misrepresentation, and (2) no evidence was presented of an
injury caused by any alleged misrepresentations.  According to
cross-appellants, before SecurityComm’s failure to comply could be excused by
any of the misrepresentation excuses presented in the charge (fraud, equitable
estoppel, and negligent misrepresentation), SecurityComm had to demonstrate
that it justifiably relied on the misrepresentation and that such
misrepresentation caused SecurityComm injury.

The misrepresentation-related excuses were presented
to the jury, in questions 11, 20, and 21, as follows:

A failure to comply is excused if [Brocail or Engleman]
committed fraud. 

Fraud occurs when:

a.         there
is a false representation of a past or existing material fact;

b.         the
false representation is made to a person for the purpose of inducing that person
to enter into a contract; and

c.         the
false representation is relied on by that person in entering into that contract.

A failure to comply is excused if [Brocail or Engleman] is equitably
estopped from receiving payment.

Equitable estoppel occurs when:

1.         [Brocail or Engleman] —

a.         by
words or conduct made a false representation or concealed material facts;

b.         with
knowledge of the facts or with knowledge or information that would lead a
reasonable person to discover the facts; and

c.         with
the intention that SecurityComm would rely on the false representation or
concealment in acting or deciding not to act; and

2.         SecurityComm

a.         did not know and had no
means of knowing the real facts; and

b.         relied
to its detriment on the false representation or concealment of material facts.

            . . . .

A failure to comply is excused if that party or its or his
agent made a negligent misrepresentation. Negligent misrepresentation occurs
when —

a.         a
party makes a representation in the course of its business or in a transaction
in which it has a pecuniary interest,

b.         the
representation supplies false information for the guidance of others in their
business, and

c.         the
party making the representation did not exercise reasonable care or competence
in obtaining or communicating the information.

 

These instructions and definitions, however, did not
require the jury to find either “justifiable” reliance or injury in order to
find that SecurityComm’s performance was excused due to the
misrepresentations.  The language regarding negligent misrepresentation
contains no suggestion of either element.  Although the language concerning fraud
and equitable estoppel mentions the concept of reliance, it did not require the
reliance in question to be “justifiable,” and it does not mention injury.  The excuse
language in the charge appears to have been submitted by cross-appellants in
their proposed jury charge, and it is similar to SecurityComm’s proposed charge
on this issue.  We cannot review the sufficiency of the evidence against a
legal standard that was not submitted to the jury and that was not the subject
of an objection or request by either party.  Osterberg, 12 S.W.3d at 55;
Morris, 287 S.W.3d at 409.  Consequently, cross-appellants’ contentions
that they conclusively demonstrated a lack of justifiable reliance and that
there was no evidence of injury are not reviewable and are without merit.  We
overrule cross-appellants’ second and third issues.

Although in their fourth and fifth issues,
cross-appellants attack the sufficiency of the evidence relating to certain
representations—respectively, they argue that the representations regarding
certain tax figures were mere expressions of opinion and not actionable
statements of fact and that there was no evidence the representation about an
accounts receivable of $660,000 was false—we need not reach these issues.  The
jury’s finding of excuse based on misrepresentations by cross-appellants is
supportable by other alleged misrepresentations that cross-appellants do not
further specifically challenge.  For example, cross-appellants acknowledge that
SecurityComm raised issues at trial concerning misrepresentations that (1) all
of Westex’s tax returns had been timely filed, and (2) there were no claims,
and no notice of potential claims, for further tax liability at the time of
closing.  Because the jury’s excuse findings are supported by these alleged
misrepresentations, we need not consider cross-appellants’ fourth and fifth
issues.  These issues are overruled.  Cross-appellants are entitled to no
relief in their appeal.

V.  Westex Appeal

In the portion of the lawsuit concerning NXS’s claims
for payment on a promissory note from Westex, the trial court (1) disregarded
the jury’s answer to question no. 15 (in which the jury determined that Westex
had not failed to pay NXS on the note); (2) held that a novation did not occur
which would have extinguished the promissory note obligation (an issue tried to
the court); and (3) granted judgment favoring NXS for $150,642 plus costs,
post-judgment interest, and attorney’s fees.  In three issues, Westex specifically
contends that the trial court erred in (1) disregarding the jury’s response to
question no. 15; (2) finding that a novation did not occur; and (3) awarding
attorney’s fees to NXS.[14]

A.  Question No. 15

            In its first
issue, Westex contends that the trial court erred in disregarding the jury’s
answer to charge question no. 15, which asked, “Did Westex fail to pay the
NXS/Westex note?”  The charge did not contain any further instructions or
definitions related to this question.  The jury answered “[n]o.”  The trial
court disregarded that answer.[15]

On appeal, Westex does not assert that it in fact
paid the note, but instead argues that the trial court erred in disregarding
the jury’s response because Westex was not required to pay the note.  In other
words, Westex would have us interpret the query set forth in question no. 15
such that if Westex was not required to pay the note or was excused from paying
the note for some reason then it could not be found to have failed to pay the
note.  However, even taking Westex’s construction of question no. 15 as proper,
we find its arguments to be without merit.  Specifically, Westex contends that
it was not required to pay the note because (1) no demand for payment was ever
made; (2) Engleman, the principal of NXS, was found to have perpetrated fraud
against SecurityComm; and (3) there was evidence that the Westex unitholders agreed
prior to the sale to SecurityComm that Westex would not have to pay the note
until its financial condition improved, and there was no evidence that its
condition ever improved.

1.  Demand

Westex’s demand arguments are not sufficiently
briefed.  See Tex. R. App. P. 38.1 (i) (“The brief must contain a clear
and concise argument for the contentions made, with appropriate citations to
authorities and to the record.”).  Westex fails to cite any legal or factual
basis for the proposition that NXS was required to demand payment before Westex
was required to pay.  Beyond basic citation regarding the standard of review
for a trial court’s disregarding of a jury answer, Westex cites no case law
regarding payment or demand.  Instead, Westex bases its demand arguments on the
alleged facts that (1) Engleman, the principal of NXS, never required
Westex to pay the note because of Westex’s financial condition, (2) no demand
was made for Westex to pay the note, and (3) a letter was sent by NXS’s
attorney to SecurityComm demanding SecurityComm pay the note as it had agreed
to do in the Acquisition Agreement.  None of this evidence, however,
establishes that NXS was required to demand payment before payment from Westex
was due.

The note itself states that it was payable ninety
days from the date the note was created, which would have made it payable on
October 15, 2003.  The note does not state that it is “payable on demand.”  See
generally Tex. Bus. & Comm. Code § 3.108 (differentiating notes
“payable on demand” from notes “payable at a definite time”).  The only mention
of demand comes in a paragraph discussing notice of default:

In the event of a default, before exercising any of Payee’s
remedies . . . Payee will first give maker written notice of default and Maker
will have ten days after notice is given in which to cure the default.  If the
default is not cured ten days after notice, Maker . . . waive[s] all demand for
payment, presentation for payment, notice of intention to accelerate maturity,
notice of acceleration of maturity, protest to the extent permitted by law.

 

The note further specifies
that “[a]t the option of Maker, Maker may repay the unpaid principal balance of
this Note at any time, in whole or in part, without premium of [sic] penalty.” 
Westex neither discusses nor makes an argument based upon the actual terms of
the note.  We decline to craft a demand argument for Westex.

2.  Engleman’s Alleged Fraud

Next, Westex contends that the jury’s finding that
Engleman, NXS’s principal, had committed fraud against SecurityComm excused Westex’s
payment of the note.  The entirety of Westex’s briefing on this assertion is as
follows:

Engleman, along with his co-plaintiffs/counter-defendants,
was found to have perpetrated fraud upon SecurityComm for multiple
misrepresentations made to induce SecurityComm to enter into the Acquisition
Agreement thereby relieving SecurityComm of any obligation to pay Engleman or
NXS any money for the purchased debt.  This is further evidence the jury could
have considered in determining that Westex was not obligated to pay the NXS
Note because it had been purchased by SecurityComm.

 

(citation to entire jury
charge omitted).

            This argument is
likewise insufficiently briefed.  See Tex. R. App. P. 38.1 (i). 
Although the jury did find that Engleman “commit[ed] fraud against SecurityComm
in connection with the Acquisition Agreement,” Westex offers no argument or
legal citation explaining how this finding excused Westex’s payment on the note
to NXS.  Moreover, Westex fails to cite to or discuss any alleged evidence of
fraud or to explain how that conduct excused Westex’s performance on the note,
which pre-existed the Acquisition Agreement.  We decline to make Westex’s
argument for it.

3.  Payment Abatement

            Next, Westex
contends that prior to the sale of SecurityComm, NXS and Engleman, on the one
hand, agreed with all of the “Westex unitholders,” on the other hand, that
Westex did not have to pay NXS on the note until such time as its financial
condition permitted it to do so.  Westex further asserts that it was never in a
financial condition to repay the note.  Westex concludes, based on this alleged
abatement agreement and alleged inability to pay, that it was excused from
paying the note.

In support of this argument, Westex cites to
testimony by Hooks, Westex’s CFO prior to the acquisition by SecurityComm, and
by Engleman, an owner or unitholder of both NXS and Westex (prior to the
acquisition).  The testimony cited by Westex, however, does not support its
conclusions.  In his testimony, Hooks stated that under the terms of the note
itself, Westex was obligated to pay the note as of October 15, 2003.  He
acknowledged that Westex would not have been able to pay the note until it
became profitable and that “[i]t would have been a burden” to pay it in 2003. 
He further explained that since Engleman was involved in the ownership of both
Westex and NXS, he (Engleman) “wasn’t in a hurry” to get paid and the note was
not expected to be paid in December 2003 (at the time of the acquisition).  He
further noted that while restructuring of the note was a possibility at the
time, this never took place because Westex “put itself on the market.”  In his
testimony, Engleman also acknowledged that Westex was not in a position to pay
the note in 2003.  Engleman further believed that both SecurityComm and Westex were
obligors on the note.[16]

 

The cited testimony establishes that Engleman did not
require payment of the note in 2003 and that Westex would have had trouble
paying the note at that time; however, it does not support the assertion that
an agreement was reached whereby Westex was excused from paying until such time
as its financial condition enabled it to do so.  There is no direct evidence of
such agreement, and the implication of the testimony is only that Engleman
refrained from collecting on the note while Westex was unable to pay it, not
that an agreement was reached abating the terms of the note.  Consequently,
Westex’s payment abatement argument is without merit.  Because Westex has
failed to demonstrate that the trial court erred in disregarding the jury’s
answer to question no. 15, we overrule Westex’s first issue.[17]

B.  Novation

            In its second
issue, Westex challenges the trial court’s finding that a novation did not
occur.  During trial, the parties agreed to have the trial court, rather than
the jury, decide the issue of novation.  In granting judgment favoring NXS on
the promissory note, the court held that no novation occurred.  Westex did not request,
and the trial court did not enter, findings of fact or conclusions of law on
this issue.[18]

A novation is the substitution of a new agreement
between the same parties or the substitution of a new party on an existing
agreement so that only the new obligation may be enforced.  Honeycutt v.
Billingsley, 992 S.W.2d 570, 576 (Tex. App.—Houston [1st Dist.] 1999, pet.
denied).  In order to prove novation, the party alleging it must establish:  (1)
the validity of a prior obligation, (2) an agreement among all parties to
accept a new contract, (3) the extinguishment of the prior obligation, and (4)
the validity of the new agreement.  Vickery v. Vickery, 999 S.W.2d 342,
356 (Tex. 1999); In re Bath Junkie Franchise, Inc., 246 S.W.3d 356, 364
(Tex. App.—Beaumont 2008, orig. proceeding).  It can be inferred that a new contract
is a novation of a previous agreement if the two are so inconsistent with one
another that they cannot subsist together.  In re Bath Junkie, 246
S.W.3d at 364.  In the absence of such inconsistency, a new contract operates
as a novation only if the parties to both contracts agree that the obligations
of the new contract are to be substituted for, and operate as a discharge of,
the obligations of the previous agreement.  Id.  Ultimately, whether a
new contract operates as a novation of a previous agreement is a question of
intent.  Id.  Because a novation is never presumed, intent must be clear
from the evidence.  Id.

When the trial court has not filed findings of fact
and conclusions of law, we infer that the trial court made all necessary
findings to support its judgment and will uphold those findings if supported by
sufficient evidence.  Chenault v. Banks, 296 S.W.3d 186, 189 (Tex.
App.—Houston [14th Dist.] 2009, no pet.) (citing Holt Atherton Indus., Inc.
v. Heine, 835 S.W.2d 80, 83–84 (Tex. 1992)).  Generally, we apply the same
standards in reviewing the legal and factual sufficiency of the evidence
supporting a trial court’s findings as we do when reviewing the legal and
factual sufficiency of the evidence supporting a jury’s answer to a jury
question.  Jones v. Smith, 291 S.W.3d 549, 552 (Tex. App.—Houston [14th
Dist.] 2009, no pet.).

Westex asserts that three of the four elements of
novation are undisputed:  the NXS note was a valid pre-existing contract, the
parties entered into a new agreement (the Acquisition Agreement) regarding the
debt, and the new agreement was a valid one (elements 1, 2, and 4 as defined
above).  Consequently, Westex focuses its attention on the third element: 
whether the obligations under the previous contract were extinguished,
rendering only the new agreement enforceable for the debt.  Specifically,
Westex contends that in entering the Acquisition Agreement, the parties agreed,
among other things, that SecurityComm would be replaced as obligor or payor on
the debt in exchange for the surrender of Engleman’s units in Westex.

 

The portion of the Acquisition Agreement governing
the transfer of Engleman’s units to SecurityComm is found in section 1.02(b),
which reads as follows:  

In consideration for the surrender by Andrew Engleman
(“Engleman”) of 125 Westex Units, Purchaser [SecurityComm] shall pay that
certain promissory note of Westex in the original principal amount of $100,000
payable to the order of NXS Construction (the “NXS Construction Note”) together
with interest thereon, as follows:  Purchaser shall pay an aggregate of
$100,000 in cash, plus $2,599 representing accrued and unpaid interest thereon,
to Engleman or his designee by delivery of $22,599 in cash on December 8, and
$20,000 in cash on each of December 15, December 22 and December 29 and January
8, respectively, in immediately available funds by confirmed wire transfer to a
bank account to be designated by Mr. Engleman (such designation to occur no
later than the business day prior to the Closing Date).  Mr. Engleman hereby
represents that he is authorized to enter into this agreement on behalf of the
holder of the NXS Construction Note and he further agrees, on behalf of such
holder, that Purchaser shall be and is hereby authorized and granted a 20 day
grace period following the due date of each payment due under the NXS
Construction Note during which to deliver payment, and that, during such grace
period, neither Purchaser nor the original maker shall be in default or deemed
to be in default. Upon payment of in full of the NXS Construction Note,
Engleman shall surrender such note to the Purchaser marked “Paid in Full.”

 

The difficulty for Westex is that although this
section obligates SecurityComm to pay the NXS note, it does not extinguish the
note itself or indicate that Westex was being released from its obligation to
pay the note.  To the contrary, it implies that Westex was still obligated on
the note, in that it established a twenty-day grace period for each of the five
scheduled payments, during which neither SecurityComm (“Purchaser”) nor Westex
(“original maker”) would be deemed to be in default.  If the intent of the parties
entering the Acquisition Agreement had been to fully supplant Westex as obligor
on the note (i.e., extinguish the previous contract), the language granting
a grace period to Westex would be meaningless surplusage.  In interpreting a
written instrument, our primary aim is to ascertain the parties’ true intent as
expressed in the contract, and to that end, we examine the writing as a whole
in an effort to harmonize and give effect to all the provisions of the
contract, so that none will be rendered meaningless.  rePipe, Inc. v. Turpin,
275 S.W.3d 39, 44 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing Seagull
Energy E & P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex.
2006) and J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.
2003)).

In addition to this language indicating that Westex’s
obligation on the note survived execution of the Acquisition Agreement, it is
also important to note the lack of any express indication to the contrary, i.e.
that Westex’s obligation was in fact extinguished.  Westex suggests that such extinguishment
can be found in section 5.07 of the Acquisition Agreement.  That section
provides a release for Westex from any obligations owed to any unitholders of Westex:

Each Unitholder hereby expressly and irrevocably RELEASES,
ACQUITS and DISCHARGES Westex and its respective officers, directors and
shareholders from any and all obligations, liens, claims, liabilities and
causes of action arising on or before the date hereof that he may have against
Westex or any of its respective officers, directors and shareholders save and
except obligations of Purchaser under this Agreement and the agreements,
instruments and documents contemplated herein.

 

Interpreting this release provision as extinguishing Westex’s
obligation to NXS under the promissory note is problematic, however, because the
provision applies only to obligations owed to “unitholders” of Westex.  NXS was
not a unitholder of Westex.[19] 
Westex mentions, but does not develop, the possibility that the corporate veil
between Engleman and NXS should be pierced such that any obligation to NXS would
be viewed as an obligation to Engleman.  The Acquisition Agreement itself appears
internally inconsistent on the topic.  In the preamble, it indicates that
Engleman is a unitholder but does not indicate that NXS is a unitholder.  It
then states that “Unitholders are the record and beneficial owners of all of the promissory notes issued by Westex and
all of the outstanding membership interests in Westex.”  This language could be
read as suggesting that as principal of NXS, Engleman was the beneficial owner
of the NXS promissory note.  However, in section 1.02(b) (set forth in its
entirety above), the Acquisition Agreement reflects that “Engleman hereby
represents that he is authorized to enter into this agreement on behalf of the
holder of the NXS Construction Note,” and that “on behalf of such holder,” he
agrees to a grace period for payments on the note.  This language even more
directly suggests that Engleman was not himself the holder of the NXS note but
was acting only on the holder’s behalf in agreeing to a grace period.

More importantly, whether the Acquisition Agreement operates
as a novation of Westex’s preexisting obligation on the note is a question of
intent which must be clearly set forth and cannot be presumed.  See In
re Bath Junkie, 246 S.W.3d at 364.  The Acquisition Agreement does not
clearly extinguish Westex’s obligation on the note.  Beyond the terms of the
agreement, Westex again turns to the testimony, discussed above, that it
contends establishes that the Westex unitholders absolved Westex from repaying
the note due to its financial condition.  We reject Westex’s interpretation of
this testimony because at most, it shows that Engleman, as principal of NXS,
did not require payment of the note in 2003 and that Westex would have had
trouble paying the note at that time.  It does not establish that Westex’s
obligation was extinguished.[20] 
Furthermore, as fact-finder, the court could have considered other evidence
indicating that Westex’s obligation had not been extinguished.  Engleman
himself testified that Westex still owed money on the note according to his
understanding of the transaction.  Furthermore, the one payment on the note
made after execution of the Acquisition Agreement came from Westex and not
SecurityComm.

Because the evidence does not clearly establish that
a novation occurred, we affirm the trial court’s holding that Wextex failed to establish
novation.  Accordingly, we overrule Westex’s second issue.

C.  Attorney’s Fees

            Westex’s argument
regarding the award of attorney’s fees to NXS, presented as its third issue, is
conditioned on our finding that the trial court erred in awarding damages to
NXS for Westex’s failure to pay the promissory note.  Because we affirm the
trial court’s award of damages to NXS, we also affirm the trial court’s award
of attorney’s fees to NXS.  We overrule Westex’s third issue.

VI.  Conclusion

            Having overruled
each of the issues raised in the three appeals, we affirm the trial court’s
judgment.

 








                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

 

 

Panel consists of Chief Justice
Hedges and Justice Yates.[21]

 









[1]
SecurityComm apparently sold Westex to a third party in the summer of 2004.





[2]
As discussed below, the jury found that SecurityComm incurred no past damages
as a result of the fraud.





[3]
“Out-of-pocket” damages in fraud cases typically require a computation of the
difference between the value of what the injured party gave and the value that
the party received.  Formosa Plastics Corp. USA v. Presidio Eng’rs and
Contractors, Inc., 960 S.W.2d 41, 49 (Tex. 1998).  





[4]
Nothing in this opinion should be interpreted as approving the manner in which
the fraud damages issues were submitted to the jury.  Of particular concern is
the lack of definitions and instructions to the jury regarding how to calculate
out-of-pocket expenses.  See generally State Bar of Tex., Pattern Jury
Charges:  Business, Consumer, Insurance, Employment 115.3, 115.9, and 115.19
(2002); 41 Tex. Jur. 3d §§ 107-110 (West 2007).





[5]
This is also the exact same amount requested by SecurityComm’s counsel in
closing argument while referencing exhibit 299.





[6]
The parties initially wage a semantic debate regarding whether the trial court
used the proper terminology in rendering its conclusion.  Specifically,
although the jury charge (following the reasonable probability rule) indicated
that future damages had to be reasonably probable, the trial court disregarded
the jury’s findings because it determined that the damages awarded were “conjectural,
speculative, and contingent” and thus “too uncertain” to be sustained.  We
interpret the trial court’s language as merely explaining why the reasonable
probability rule had not been met in this case.  See Whole Foods Mkt.
Sw., L.P. v. Tijerina, 979 S.W.2d 768, 781-82 (Tex. App.—Houston [14th
Dist.] 1998, pet. denied) (holding evidence based on speculation was not
sufficient to support award of future damages).  





[7]
Under section 111.020, an entity acquiring a business from another entity that
is liable for business taxes must withhold an amount from the purchase price
sufficient to pay the amount of taxes due; if the entity fails to do so, it may
be liable for the owed amount up to the total amount of the purchase price. 
Tex. Tax Code § 111.020.





[8]
In a reply brief, SecurityComm also cites to testimony from Hooks, former
Westex CFO.  The gist of this testimony, however, was not that Westex kept
inadequate accounting records from which taxes could not be calculated but that
(1) at one point, the estimated number of phone lines was miscalculated, and
(2) the best way to calculate taxes on a business is to hire a consultant and
that is exactly what Westex did prior to SecurityComm’s acquisition.  This
testimony offers no support for SecurityComm’s assertion that the State’s audit
could not be contested because of the state of Westex’s books under appellees.





[9]
Jury questions 25 and 27 limited the jury’s response to damages proximately
caused by the alleged fraud.





[10]
We decline to interpret the trial court’s charge so broadly as to permit
SecurityComm to recover for amounts that it agreed to be responsible for in the
contract between the parties.  It expressly agreed to such liability, thus it
was not proximately caused by the alleged fraud.  As defined by the charge,
“‘proximate cause’ means that cause which . . . produces an event, and without
which cause such event would not have occurred.”  Moreover, during oral
argument before this court, counsel for SecurityComm argued that its damages
were the “nondisclosed liability” of Westex.  Accordingly, SecurityComm itself
appears to have conceded that it was not entitled to damages for amounts it
agreed to be liable for in the acquisition.





[11]
In fact, a breach of contract occurs when a party fails or refuses to do
something it has promised to do.  Seureau v. ExxonMobil Corp., 274
S.W.3d 206, 227 (Tex. App.—Houston [14th Dist.] 2008, no pet.); see also
Bossier Chrysler-Dodge II, Inc. v. Riley, 221 S.W.3d 749, 755 (Tex.
App.—Waco 2007, pet. denied) (holding a failure to comply with representations
regarding future conduct was actionable).





[12]
Under the charge, SecurityComm’s failure was excused if the jury found that
appellees committed fraud, equitable estoppel, or negligent representation,
among other possibilities.  The jury found SecurityComm’s failure was excused
but was not required to specify the reason or reasons for so finding.





[13]
Although cross-appellants did not address all of the excuse grounds contained
in question 11 in their stated appellate issues, they did sufficiently address
all of the grounds in their appellate arguments.





[14]
In a fourth issue, Westex contended that the trial court erred in refusing to
apply a settlement credit (the DiCecco credit) to the damages awarded to NXS. 
However, Westex conceded this issue during oral argument.  Consequently, we
will not address the merits on this issue and summarily overrule it.





[15]
In examining Westex’s issues pertaining to the trial court’s disregarding of
question no. 15, we apply the same standards of review as set forth under
similar issues above.





[16]
When asked whether he thought SecurityComm and Westex were obligors on the
note, Engleman initially responded by only saying “SecurityComm,” but he then
said:  “I think that both of them owe me money.” 





[17]
Westex further suggests that the jury might have found that Westex did not fail
to pay the note because a novation occurred, excusing Westex from that
obligation.  However, the issue of novation was not presented to the jury and
was, in fact, expressly reserved for the trial court’s determination.





[18]
In stating its ruling on the novation issue, the court said that “there was . .
. no novation as a matter of law.”  The parties did not offer additional
evidence on the novation issue outside the presence of the jury but relied on
the evidence previously presented in making their arguments.





[19]
The Acquisition Agreement expressly identifies the Westex unitholders as
Brocail, Hooks, Engleman, and Hanley.





[20]
Westex further contends in the novation argument that the jury’s answer to
question no. 15 indicates an implied finding of extinguishment of Westex’s
liability on the note.  But because the issue of novation was tried to the
court and not the jury, the jury’s answer to question 15 (which did not inquire
about novation) is not relevant to our review of the court’s novation holding.





[21]
Justice Sullivan was assigned to the panel for this case and participated
during oral argument.  However, he has subsequently resigned from the court and
did not participate in deciding this case.  “After argument, if for any reason
a member of the panel cannot participate in deciding a case, the case may be
decided by the two remaining justices.”  Tex. R. App. P. 41.1(b).